Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/30/2024 09:05 AM CDT

State of Nebraska, appellee, v.
Peh B. Lu, appellant.

___ N.W.3d ___

Filed July 23, 2024.    Nos. A-24-198, A-24-199.

1. **Criminal Law: Courts: Juvenile Courts: Jurisdiction: Appeal and Error.** A trial court's denial of a motion to transfer a pending criminal proceeding to the juvenile court is reviewed for an abuse of discretion.
2. **Judgments: Words and Phrases.** An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.
3. **Courts: Juvenile Courts: Jurisdiction.** In conducting a hearing on a motion to transfer a pending criminal case to juvenile court, the court should employ a balancing test by which public protection and societal security are weighed against the practical and nonproblematical rehabilitation of the juvenile.
4. ____: ____: ____. On a petition to transfer a criminal case to juvenile court, to retain the proceedings in district court, the court need not resolve every statutory factor against the juvenile, and there are no weighted factors and no prescribed method by which more or less weight is assigned to a specific factor.
5. **Courts: Juvenile Courts: Jurisdiction: Proof.** In a motion to transfer a criminal case to juvenile court, the burden of proving a sound basis for retention lies with the State.
6. **Courts: Juvenile Courts: Jurisdiction: Appeal and Error.** When ruling on a motion to transfer a juvenile's case, the trial court must make a statement of its findings that provides sufficient specificity to permit meaningful review by appellate courts.
7. **Courts: Jurisdiction.** While it is the better practice for a trial court to refer to all the statutory factors governing a petition to transfer, the court is not required to do so.

8. **Courts: Juvenile Courts: Jurisdiction: Proof.** Because it is the State's burden to prove that a sound basis exists for retaining a case in the district court, any statutory factor found not to favor retention should be considered a factor that favors transfer to the juvenile court.

9. **Courts: Juvenile Courts: Jurisdiction.** A defendant's young age by itself does not support the transfer of a criminal case to the juvenile court.

10. **Courts: Juvenile Courts: Jurisdiction: Evidence.** When a district court's basis for retaining jurisdiction over a juvenile is supported by appropriate evidence, it cannot be said that the court abused its discretion in refusing to transfer the case to juvenile court.

11. ____: ____: ____: ____. The customary rules of evidence do not apply in juvenile transfer hearings, and the district court must consider all the evidence and reasons presented by both parties before issuing its ruling.

12. **Appeal and Error.** Harmless error jurisprudence recognizes that an error is only prejudicial and requires reversal when, in light of the totality of the record, the error influenced the outcome of the case.

Appeals from the District Court for Douglas County: LeAnne M. Srb, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, Bethany R. Stensrud, and Hilary A. Drawz for appellant.

Michael T. Hilgers, Attorney General, and Erin E. Tangeman for appellee.

Moore, Bishop, and Arterburn, Judges.

Arterburn, Judge.

## I. INTRODUCTION

In this consolidated appeal, 17-year-old Peh B. Lu appeals the order of the district court for Douglas County denying his request to transfer the criminal proceedings against him to the juvenile court. After reviewing the record, we conclude that the evidence supported retention of these two cases in the district court. Based on many factors, including Lu's need for supervision and rehabilitation beyond the age of majority and the consideration of public safety, we conclude

that the district court did not abuse its discretion in denying Lu's motion to transfer these cases. We affirm the district court's order.

## II. BACKGROUND

In November 2023, the State filed two cases against Lu in the district court. In the first case, the State filed an information charging Lu with two counts: (1) robbery and (2) criminal conspiracy to commit robbery, both Class II felonies. The information indicated that the event which gave rise to these charges occurred on July 15, 2023. In the second case, the State filed an information charging Lu with three counts: (1) robbery, (2) criminal conspiracy to commit robbery, and (3) use of a deadly weapon (firearm) to commit a felony, a Class IC felony. The information indicated that the event which gave rise to these charges occurred on July 16, 2023. In July 2023, Lu was 16 years 2 months old, having been born in May 2007.

In each case, Lu filed a motion requesting to transfer the proceedings against him to the juvenile court pursuant to Neb. Rev. Stat. § 29-1816 (Cum. Supp. 2022). On March 1, 2024, a juvenile transfer hearing was held addressing both cases. The evidence established that Lu is a Karen national who was born in Thailand in a refugee camp. He has been in the United States since he was a young child.

During the hearing, the State offered 23 exhibits into evidence, including the following: police reports that gave rise to Lu's charges; various photographs, videos, social media posts and messages collected during the investigation; Lu's criminal history and arrest records; certified copies of Lu's two prior, yet still active, juvenile case files and related police reports; Lu's juvenile intake summaries; a memorandum prepared by Lu's juvenile probation officer detailing the probation services Lu has received since August 2021; and information regarding the services available at the Douglas County Youth Center (Youth Center), the Nebraska Department of Correctional Services, and the juvenile probation office.

Lu offered several exhibits into evidence as well. This evidence included probation review reports, a letter detailing Lu's participation and progress in therapy services, Lu's medical records, Boys Town progress reports, and various certificates and awards Lu received at Boys Town. Lu also offered two exhibits that were not received by the court. Exhibit 36 is an affidavit from an assistant public defender regarding immigration law. The assistant public defender avers in her affidavit that she advised Lu of the potential immigration consequences, including removal from the country, if he were convicted of robbery or conspiracy to commit robbery. The State objected to exhibit 36 on relevancy grounds, and the court sustained the objection.

Lu also offered exhibit 37, which is a deposition of Colleen Conoley, Ph.D., taken for a separate, unrelated case in 2014. Conoley's deposition includes testimony about child brain development and the impact it has on children and their behaviors. The State objected to exhibit 37, arguing that the deposition was 10 years old, that the State had no basis to determine whether the testimony was still accurate, and that the deposition was irrelevant to the facts of this case. The district court agreed and sustained the objection.

### 1. July 2023 Robberies

Officer Jessica Rich of the Omaha Police Department is a robbery detective who, in the summer of 2023, was assigned to investigate cases connected to the "ABZ" gang, otherwise known as the Asian Boys Zone gang. The first case she investigated involved a robbery perpetrated by three suspects on July 15, 2023. The victim, Paul Kladstrup, reported that he parked his vehicle near an ATM on Underwood Avenue in Omaha, Nebraska. After exiting his own vehicle, a white Hyundai pulled up behind him. The driver of the Hyundai exited the vehicle and pointed a black handgun at Kladstrup, forcing him to hand over his cash, which totaled $62. Kladstrup observed the Hyundai's front passenger

stand outside the Hyundai and the backseat passenger exit the Hyundai and enter the driver's seat of Kladstrup's car. Kladstrup said, "'Don't steal my car, please.'" After taking Kladstrup's money, the suspects returned to the Hyundai and fled the scene. Kladstrup informed the police that the suspects appeared to be young Hispanic males but that each suspect was wearing a dark-colored hoodie with the hood cinched tight, leaving only their eyes visible.

Rich identified suspects in the July 15, 2023, robbery through her investigation of a separate robbery that occurred on July 23. While investigating the July 23 robbery, Rich obtained a search warrant for a suspect's "Instagram account." While reviewing the account, Rich found a group chat containing 23 other accounts. Rich obtained additional warrants for each of those accounts. One of those accounts belonged to Lu.

Rich reviewed the messages on Lu's Instagram account. She found a picture of Lu holding a liquor bottle and several pictures of him holding firearms. Additionally, there were two videos where Lu was shooting a firearm outdoors amongst several other individuals, who also appeared to be minors. Rich testified that in Lu's messages, he admitted to stealing ammunition from stores and encouraged others to do so as well.

On July 15, 2023, the day of the robbery, Lu messaged another party, A.K., asking to meet up. A.K. replied that he would meet Lu at "'the Walmart by northwest.'" Another conversation between Lu and a third party, T.Y., occurred on the same day. Lu instructed T.Y. to "'go to Walmart.'" Rich also found a separate conversation between T.Y. and A.K. that occurred on July 15. T.Y. asked A.K. where he was, and A.K. responded that he was "'going to luski.'" T.Y. responded that he was already with "'Luski.'" Rich determined from the numerous messages that Lu "was often referred to as 'Luski.'"

Rich obtained and reviewed surveillance video from the Walmart store closest to Northwest High School. The video

showed a white Hyundai Sonata and a dark gray Hyundai Sonata enter the Walmart parking lot and park next to each other for several minutes. Neither car had license plates, and the white Hyundai had visible damage on the passenger side. These vehicles were later found to have been reported stolen.

Rich also reviewed surveillance video from a gas station located on Underwood Avenue. This video showed a white Hyundai Sonata arrive and park near the ATM at 7:52 a.m. Rich determined that this was the same white Hyundai seen on the surveillance video from Walmart. Rich concluded that the surveillance footage was consistent with Kladstrup's account of the robbery.

Additional surveillance video from a nearby church showed the same white Hyundai Sonata arrive at the church parking lot around 8:30 a.m. The Hyundai was parked and abandoned in the parking lot at that time. Rich observed five suspects exit the vehicle, one of whom matched Lu's physical description. The white Hyundai Sonata was recovered by the police, and it was confirmed to have been reported stolen. Lu's fingerprints were found on the vehicle.

Based on Rich's review of the evidence and messages, she concluded that it was Lu's idea to commit the robbery and that he persuaded the other suspects to participate.

Rich also investigated a robbery involving at least two suspects that occurred on July 16, 2023. The victim, Raoul Kolani, reported to police that while he was visiting a park in Omaha, his car was stolen. After parking his car and walking into the park, Kolani observed a blue sedan pull up behind his car. Kolani noticed that the front driver's side window of his car was broken and that an Asian male was in the driver's seat. As Kolani ran over to his car, the suspect started it. Kolani reached his car and grabbed at the driver's door handle, but the car was locked and slowly rolling away. The car rolled over the curb, onto the grass, and into a tree. The suspect in the driver's seat crawled out of the car window.

Kolani stated that a second suspect exited the blue sedan and approached him from behind. This second suspect pulled out a gun, which Kolani described as a black semiautomatic "'boxy, heavy, bold looking . . . Glock 19 or 17'" handgun. Kolani stated that the gun also had a light and a green laser attachment. The suspect with the gun yelled "'you better walk away, we're taking it'" and had the laser activated and pointed at Kolani's chest. Kolani ran away and called the police.

Minutes after Kolani's call, officers spotted his car traveling east. The officers followed the car, and an air support unit provided assistance. The air support officers observed the car traveling at a high rate of speed and committing multiple traffic violations. The car eventually came to a stop on Ellison Avenue, where both suspects fled from the car.

One suspect exited from the driver's door. The other suspect, later identified as Lu, exited from the passenger side of the car and discarded a black "Nike Air Max" bag, which contained a black handgun with a green laser. Officers pursued, detained, and arrested Lu and the other suspect. Lu matched Kolani's description of the suspect who held him at gunpoint. In addition, pictures taken from Lu's Instagram account depict Lu holding the handle of a firearm that is placed partially inside a black "Nike Air Max" bag. Other pictures depict Lu holding a firearm with a green laser.

Upon further investigation, Rich found a conversation from T.Y.'s Instagram account detailing the July 16, 2023, robbery. T.Y. indicated that it was Lu's idea to steal a car. T.Y. stated that Lu instructed him to break a car window and that he complied. T.Y. also stated that Lu was the suspect who pointed a gun at the victim.

Rich testified that during her broader investigation of the Asian Boys Zone, she determined that the gang was associated with approximately 50 crimes. She stated that a large majority of the crimes involved stolen vehicles, particularly Hyundais and Kias. Gang members were also known to steal property they found in the vehicles they stole or damaged.

Rich testified that since Lu's arrest, there had been a noticeable decline in incidents involving Asian Boys Zone members.

## 2. Lu's History in Juvenile Court

During its case in chief, the State called Matthew Miners to testify regarding Lu's prior experiences with the juvenile court system and juvenile probation. Miners is a juvenile probation officer who works with high-risk youth. He began working with Lu in December 2021. Lu admitted to Miners that he associated with a gang.

Lu's first contact with law enforcement occurred in 2019 when he was approximately 12 years old. Lu was hunting squirrels with a pellet rifle in violation of "Games and Parks" regulations. This charge was ultimately dismissed.

In August 2021, Lu was charged with carrying a concealed weapon, unlawful possession of a handgun by a minor, and unlawful transportation of firearms. Lu was adjudicated by the juvenile court and remains on probation for this case. He was originally detained at the Youth Center, but in September 2021, Lu was transported to the Child Saving Institute, a crisis stabilization shelter.

While enrolled at the Child Saving Institute, Lu absconded. He was located, detained at the Youth Center, and eventually placed back at the Child Saving Institute. He successfully completed this program and transitioned home in January 2022. While at home, Lu was provided with additional services, including electronic monitoring, the family partner transition program, gang intervention, and community youth coaching. Participation in those services was closed unsuccessfully in April 2022 when Lu absconded from home.

While on the run in April 2022, Lu was driving a car when an officer attempted to stop him for a traffic violation. Lu evaded the stop, and the police pursued him. Police reports indicate that Lu was driving more than 100 m.p.h. and committed several other traffic violations in an attempt to flee. Lu was eventually stopped with the use of "stop sticks," which

deflated the car's tires. Lu was arrested and charged with operating a motor vehicle to avoid arrest. Miners testified that this case also remains on the active docket in juvenile court.

Once arrested, Lu was detained at the Youth Center. Lu was released to the Child Saving Institute again but immediately absconded. He was located in June 2022 and placed back at the Youth Center.

In September 2022, Lu was transferred from the Youth Center to Boys Town for purposes of a long-term placement. Miners testified that during this stay at Boys Town, Lu began to improve. He stopped skipping school, improved his grades, completed intensive outpatient treatment for marijuana use, tested negative on drug tests, and participated in individual therapy. However, Miners believed that Lu "still had work to do" and recommended to the juvenile court that Lu stay at Boys Town through the summer of 2023. Miners testified that Lu and Lu's mother agreed with his assessment and recommendation.

Despite Miners' recommendation, in June 2023, the juvenile court ordered Lu to return home in an effort to prioritize reunification. Upon his return home, Lu was not required to participate in any transitional services because of his successful performance at Boys Town.

One month later, Lu was arrested and charged with multiple counts related to the July 16, 2023, robbery. Boys Town contacted Miners and indicated that the facility was willing to readmit Lu if he agreed to stay there until he successfully completed the program and graduated from high school. Lu agreed, and the juvenile court ordered him to be placed at Boys Town until graduation. In October 2023, while at Boys Town, Lu was also arrested for the July 15 robbery. After posting bond, he returned to Boys Town and has remained there pursuant to the juvenile court's order.

Miners testified that Lu has been "doing well" during his second stay at Boys Town. Lu earned the highest grade point average on the campus and expressed a desire to attend

college. Miners described Lu as a leader in the residence in which he resides and as a great example to other minors.

Miners believed that retaining these cases in adult court would not be in Lu's best interests. When asked whether Lu needed probation services beyond the age of majority, Miners answered, "I'm not for sure. I don't know at this time." However, he agreed that there were not many juvenile services left to provide Lu.

Miners also testified that it would be detrimental to Lu's progress to pause his probationary services. Without instant supervision, Miners feared Lu would "go back to his old ways." Therefore, Miners recommended that if Lu were transferred to adult probation, he should be provided an adult probation officer immediately. So long as probation services were not paused, Miners believed that Lu would benefit from being on either type of probation. Miners explained that Lu does well when he has somebody holding him accountable.

After the State rested, Lu offered the testimony of Meghan Voigt, a family home program consultant at Boys Town. As a program consultant, Voigt assists minors at Boys Town in identifying their deficiencies and developing the skills necessary to support their growth. Voigt had been Lu's consultant since December 2022. Voigt testified that Lu was not ready to transition home in June 2023. She explained that based on the program's research, he needed to spend a year or longer at Boys Town before being released. Lu had only been at Boys Town for 9 months when he was sent home. Voigt testified that during his second stay, Lu was doing well at school, earning good grades, and was very active in therapy. She stated that he has the ability to be a strong leader and that he often leads by example.

Stacey Bergman, Lu's family teacher at Boys Town, also testified in Lu's defense. Bergman explained that her job is to fulfill the role of mother to the youths placed in her home. She testified that Lu has been placed in her home during both of his stays at Boys Town. Bergman stated that Lu was "a

pretty remorseful kid" who understood the seriousness of his actions and the potential effects they could have on his life. Bergman described Lu as a role model and testified that he was more actively involved at Boys Town during his second stay. She testified that he has earned several academic awards and is being considered for an on-campus job, which is considered an honor at Boys Town because it shows that the minor is considered trustworthy.

Josh Hinks, Lu's successful future specialist at Boys Town, testified that he works with minors such as Lu before and after graduation to set them up for success once they leave Boys Town. He explained that Boys Town provides transitional services for minors who graduate from the program, including scholarships, cell phones, vehicles, and housing. Hinks testified that these after-care resources would be available to Lu if he were permitted to stay and graduate from Boys Town.

At the conclusion of all the evidence, the district court took the matter under advisement.

### 3. District Court's Order

On March 13, 2024, the district court entered a three-page order overruling Lu's motions to transfer his cases to the juvenile court. The court found that the State had met its burden of proof and had shown a sound basis to retain Lu's cases in the district court. The details of the district court's consideration of the transfer factors contained in Neb. Rev. Stat. § 43-276 (Cum. Supp. 2022) will be provided in our analysis below.

Lu appeals the denial of his motions to transfer these cases to the juvenile court. The cases have been consolidated by this court on appeal.

### III. ASSIGNMENTS OF ERROR

Lu assigns, summarized and restated, that the district court abused its discretion in (1) failing to make the sufficient findings required under § 43-276, (2) finding a sound basis

existed to retain the matter in district court, and (3) failing to consider exhibits 36 and 37.

## IV. STANDARD OF REVIEW

[1,2] A trial court's denial of a motion to transfer a pending criminal proceeding to the juvenile court is reviewed for an abuse of discretion. *State v. Aldana Cardenas*, 314 Neb. 544, 990 N.W.2d 915 (2023). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

## V. ANALYSIS

### 1. JURISDICTION

Section 29-1816(3)(c) provides that "[a]n order granting or denying transfer of [a] case from county or district court to juvenile court shall be considered a final order for the purposes of appeal. Upon entry of an order, any party may appeal to the Court of Appeals within ten days." On March 13, 2024, the district court entered an order denying Lu's motion to transfer his cases to juvenile court. Lu filed his notice of appeal on March 15. His appeal is timely.

### 2. LEGAL FRAMEWORK

Neb. Rev. Stat. § 43-246.01(3) (Reissue 2016) grants concurrent jurisdiction to the juvenile court and the county or district courts over juvenile offenders who (1) are 11 years of age or older and commit a traffic offense that is not a felony or (2) are 14 years of age or older and commit a Class I, IA, IB, IC, ID, II, or IIA felony. Actions against these juveniles may be initiated either in juvenile court or in the county or district court. In the present case, all the allegations against Lu put him within the second category of juvenile offenders.

When an alleged offense is one over which both the juvenile court and the criminal court can exercise jurisdiction, a party can move to transfer the matter. For matters initiated

in criminal court, a party can move to transfer it to juvenile court pursuant to § 29-1816(3).

In the instant case, when Lu moved to transfer his case to juvenile court, the district court conducted a hearing pursuant to § 29-1816(3)(a), which subsection requires consideration of the following factors set forth in § 43-276(1):

(a) The type of treatment such juvenile would most likely be amenable to; (b) whether there is evidence that the alleged offense included violence; (c) the motivation for the commission of the offense; (d) the age of the juvenile and the ages and circumstances of any others involved in the offense; (e) the previous history of the juvenile, including whether he or she had been convicted of any previous offenses or adjudicated in juvenile court; (f) the best interests of the juvenile; (g) consideration of public safety; (h) consideration of the juvenile's ability to appreciate the nature and seriousness of his or her conduct; (i) whether the best interests of the juvenile and the security of the public may require that the juvenile continue in secure detention or under supervision for a period extending beyond his or her minority and, if so, the available alternatives best suited to this purpose; (j) whether the victim or juvenile agree to participate in restorative justice; (k) whether there is a juvenile pretrial diversion program established pursuant to sections 43-260.02 to 43-260.07; (l) whether the juvenile has been convicted of or has acknowledged unauthorized use or possession of a firearm; (m) whether a juvenile court order has been issued for the juvenile pursuant to section 43-2,106.03; (n) whether the juvenile is a criminal street gang member; and (o) such other matters as the parties deem relevant to aid in the decision.

The customary rules of evidence shall not be followed at such hearing, and "[a]fter considering all the evidence and reasons presented by both parties, the case shall be transferred

to juvenile court unless a sound basis exists for retaining the case in county court or district court." See § 29-1816(3)(a).

[3-5] As the Nebraska Supreme Court has explained, in conducting a hearing on a motion to transfer a pending criminal case to juvenile court, "[i]t is a balancing test by which public protection and societal security are weighed against the practical and nonproblematical rehabilitation of the juvenile." *State v. Aldana Cardenas*, 314 Neb. 544, 561, 990 N.W.2d 915, 928 (2023). "[I]n order to retain the proceedings, the court need not resolve every statutory factor against the juvenile, and there are no weighted factors and no prescribed method by which more or less weight is assigned to a specific factor." *Id.* "[T]he burden of proving a sound basis for retention lies with the State." *Id.* at 557, 990 N.W.2d at 926.

### 3. SUFFICIENT FINDINGS UNDER § 43-276

Lu alleges that the district court failed to make sufficient findings pursuant to § 43-276 to warrant retaining these cases. He notes that the district court did not make any oral findings and contends that the findings contained in the court's written order were minimal, confusing, and "generally displayed a misunderstanding of the evidence adduced at the hearing." Brief for appellant at 24.

The State disagrees. While the State acknowledges that the district court's order does not address all the factors set forth in § 43-276, it argues that the court was not required to do so. The State asserts that the court was required only "to issue an order that provided sufficient specificity to permit meaningful review by the appellate court, which it did." Brief for appellee at 19.

[6,7] Under § 29-1816(3)(a) and (b), the district court is required to consider the factors set forth in § 43-276 and set forth findings for the reason for its decision to retain or transfer a case. The Supreme Court has held that the district court must make a statement of its findings that provides sufficient specificity to permit meaningful review by appellate courts.

See, *State v. Tyler P.*, 299 Neb. 959, 911 N.W.2d 260 (2018); *State v. Trevino*, 230 Neb. 494, 432 N.W.2d 503 (1988). While it is the better practice for the trial court to refer to all the statutory factors in its order, the court is not required to do so. See *State v. Tyler P., supra*.

In *State v. Doyle*, 237 Neb. 60, 464 N.W.2d 779 (1991), the Supreme Court remanded a case back to the trial court to make specific findings as provided by the statute on a motion to transfer to juvenile court. The court found that neither the oral findings nor the court's written order sufficiently detailed the findings made in support of the order denying transfer. The trial court's written order was referred to as a "checklist" order and failed to include any case-specific facts or details.

In contrast, there have been cases where the trial court failed to discuss every factor set forth in § 43-276 or failed to specifically identify the factors relied upon in reaching its decision, and appellate courts have nonetheless affirmed the trial courts' rulings. See, e.g., *State v. Tyler P., supra*; *State v. Stewart*, 197 Neb. 497, 250 N.W.2d 849 (1977), *disapproved on other grounds*, *State v. Palmer*, 224 Neb. 282, 399 N.W.2d 706 (1986); *State v. Esai P.*, 28 Neb. App. 226, 942 N.W.2d 416 (2020). For example, in *State v. Tyler P., supra*, the Supreme Court ruled that the district court's written order, which merely set forth the transfer factors and sustained the motion to transfer, without more, would not have permitted meaningful review. However, the Supreme Court found that the oral findings made by the district court provided sufficient specificity for review. In its oral findings, the district court stated that it had weighed the statutory factors and balanced them with public safety concerns. The court specifically referenced five factors it deemed relevant to resolution of the case.

This case is more similar to *State v. Tyler P., supra*, than *State v. Doyle, supra*. This is not a case where the district court checked boxes on a template or failed to include any case-specific details in its order. Here, the district court issued a three-page written order, which included an analysis of six

§ 43-276 factors it found to be the most relevant in resolving the motion. The court did not address the remaining factors.

[8] Our review of the district court's findings is further complicated by the manner in which courts are required to assess the statutory factors as set out in *State v. Aldana Cardenas*, 314 Neb. 544, 990 N.W.2d 915 (2023). In *Aldana Cardenas*, the Supreme Court found that because it is the State's burden to prove that a sound basis exists for retaining a case in the district court, any factor found not to favor retention should be considered a factor that favors transfer. The Supreme Court found that given the burden of proof, no factor can be considered neutral or not applicable. Applying that rationale to the present case, the absence of any findings by the district court regarding the nine remaining statutory factors could arguably lead a reviewing court to conclude that the district court found those factors favor transfer to the juvenile court. In other words, the silence of the district court may imply an analysis that was not intended. Thus, it is now more important for trial courts to address all statutory factors in their rulings. A full analysis will provide clear reasoning for appellate courts to review on appeal. We again encourage trial courts to specifically address all the § 43-276 factors in their orders ruling on a motion to transfer.

Here, the record is silent regarding the district court's findings on the nine remaining factors. However, the court's order is clear that the six factors it addressed were of such weight as to convince the court that the cases herein should be retained. In similar cases where the trial court addressed only a subset of the statutory factors, we have nonetheless reviewed the additional factors. See, e.g., *State v. Esai P., supra*. We choose to follow the same path here as will be displayed in the analysis to follow.

Although the district court did not address every statutory factor and did not specifically identify which factors it was addressing, we read the court's order to incorporate or consider the following factors set forth in § 43-276(1): (a) the

type of treatment such juvenile would most likely be amenable to; (d) the age of the juvenile; (e) the previous history of the juvenile; (f) the best interests of the juvenile; (g) consideration of public safety; and (i) whether the best interests of the juvenile and the security of the public may require that the juvenile continue in secure detention or under supervision for a period extending beyond his or her minority.

As stated above, the trial court need not resolve every statutory factor against the juvenile, and there are no weighted factors and no prescribed method by which more or less weight is assigned to a specific factor. See *State v. Aldana Cardenas, supra*. Further, while it is preferable for the trial court to refer to all the statutory factors in its order, it is not required to do so. *State v. Tyler P.*, 299 Neb. 959, 911 N.W.2d 260 (2018). Therefore, because the district court addressed the factors it deemed persuasive, we cannot say that it abused its discretion by failing to address every factor or failing to address factors in a specific way. This assignment of error fails.

### 4. Was Denial of Transfer Abuse of Discretion?

In his brief on appeal, Lu alleges that the district court abused its discretion in finding a sound basis existed to retain these cases in the district court. He argues that the evidence largely favored transferring his cases to the juvenile court. The State submits that there was no abuse of discretion and that the evidence favored retention. We agree with the State that the district court did not abuse its discretion in retaining jurisdiction over these cases. We review below the district court's analysis of six statutory factors and independently review the remaining factors.

### (a) Factors Analyzed by District Court

Although the district court did not specify which factors it considered in its ruling, after reviewing the order, we have determined that the following factors were considered by the district court to weigh in favor of retaining jurisdiction.

### (i) § 43-276(1)(a)—Type of Treatment
### Amenable to Juvenile

With regard to what type of treatment Lu would be amenable to, the district court stated: "In Juvenile Court, [Lu] would only receive two more years of supervision. The fact is that may not be enough time for [Lu] to gain the knowledge and skills he needs to help him change his criminal mindset and behaviors."

Lu asserts that the district court failed to give proper weight to the fact that he was amenable to treatment and placement at Boys Town. After reviewing the record, we cannot say that the district court improperly weighed this information. To the contrary, in its order, the court acknowledged that Lu was successfully released from Boys Town in June 2023 and that employees from Boys Town advocated for his continued participation in the program. However, within 1 month after Lu was released from Boys Town, the present offenses for which he has been charged were committed. Lu's alleged conduct in these offenses was more violent and serious than the offenses for which he was on probation in the juvenile court.

Given this evidence of escalating criminal behavior, we cannot say that the court abused its discretion in finding that Lu would be more amenable to adult services. We recognize that Lu has done well when living in the structured environment provided by Boys Town. But, given our standard of review and Lu's actions following his prior release from Boys Town, we cannot say the district court abused its discretion in finding that juvenile services have been unable to fully rehabilitate him. Further, Miners, the juvenile probation officer, testified that there were not many juvenile services left to provide Lu, should the additional efforts at Boys Town fail.

### (ii) § 43-276(1)(d)—Age of Juvenile
### and Others Involved in Offenses

The court noted that Lu would turn 17 years old in May 2024. The court reiterated that Lu's age would limit him to

2 years of juvenile services, which would likely be an insufficient amount of time to treat and supervise Lu.

The district court did not mention the age of Lu's accomplices, but Rich's testimony and the police reports indicate that Lu committed these crimes with other minors. Further, social media messages established that Lu was a leader and instigator of these crimes. He boasted about his prior criminal activities to the other minors involved and encouraged them to commit crimes with him. We agree that this factor favors retention in the district court.

### (iii) § 43-276(1)(e)—Previous
### History of Juvenile

Regarding Lu's previous history, the district court stated Lu "had been receiving services through Juvenile Court from approximately August 2021 through June 2023, when he was successfully released from probation. In July 2023 - within one month of his release from probation - he participated in the offenses he is currently charged with committing." We acknowledge that the evidence did not suggest that Lu was successfully released from probation in June 2023. According to Miners, Lu continues to have two open cases in the juvenile court system and remains on juvenile probation. The district court was well aware that Lu had been placed back at Boys Town by the juvenile court after his arrest on the present charges. Therefore, the court's inadvertent reference to Lu being released from probation likely references Lu's release from Boys Town in June 2023.

The district court's concern with Lu's pattern of being released only to reoffend is not unwarranted. Lu's criminal history demonstrates that, while he thrives in structured environments such as Boys Town, to this point he has not been willing or able to transfer those behaviors and skills to life outside of Boys Town.

Lu's prior juvenile adjudications include charges of unlawful possession of a firearm and operating a motor vehicle to

avoid arrest. Prior to his placement at Boys Town, he had a history of absconding from placement homes and using or possessing firearms. In addition, Lu's current offenses are more violent than his prior charges, indicating that Lu's criminal behavior is escalating as he ages. We agree that this factor favors retention in the district court.

### (iv) § 43-276(1)(f)—Best
### Interests of Juvenile

The district court found that because Lu would likely need services beyond his minority, it was in Lu's best interests to retain these cases in the district court and provide him with adult services. Lu argues that the district court erred in finding that it was in his best interests to be tried as an adult. We agree with Lu.

After reviewing the evidence, we conclude that it would be in Lu's best interests to transfer these cases to the juvenile court. Like any other juvenile, Lu's long-term interests would be better served with adjudication in the juvenile court rather than having an adult record containing felony convictions. Additional time at Boys Town under a juvenile court placement would provide Lu with the structure that he needs, and it would allow him to continue with his rehabilitation while pursuing a high school diploma. If Lu chose to apply the lessons learned at Boys Town to his life when that program is completed, he would enjoy the best possible outcome.

We understand the district court's point that if there is insufficient time to rehabilitate a juvenile, then it may be in the juvenile's best interests to be a part of a longer-term program. But we believe the district court's analysis of Lu's best interests is more appropriate for factor (i), discussed below, which concerns the amount of time a juvenile may require in secure detention or under supervision. We find that consideration of Lu's best interests favors transfer to the juvenile court.

### (v) § 43-276(1)(g)—Public Safety

The district court determined that public safety concerns would require that Lu continue under court supervision for a period extending beyond the age of majority.

Lu asserts that the district court incorrectly analyzed this factor. He argues that by continuing in the Boys Town program, there would be no risk to public safety. While we agree that the evidence demonstrated that Lu was of minimal risk to others while he remained at Boys Town, strong evidence existed that Lu posed a risk to the public after his release. Lu's escalation of violent crimes, his targeting of random victims, his use of firearms, and his influence on others to commit violent crimes all pose a risk to public safety. His first stay at Boys Town was by all accounts a successful one. He was released in June 2023 based on his positive performance there. Only a month later, he was arrested for participating in armed robberies connected to gang activity. This pattern suggests Lu would still pose a risk to the public even if he was permitted to stay at Boys Town until graduation. We agree with the district court that this factor favors retention in the district court.

### (vi) § 43-276(1)(i)—Whether Juvenile's Best Interests and Public Security Require Juvenile to Continue in Secure Detention or Under Supervision for Period Extending Beyond His Minority

The district court found that Lu's best interests and the security of the public required that Lu continue in secure detention or under supervision beyond the age of 19. Lu argues that because Miners testified only that he was unsure of whether Lu would require services beyond age 19, the State failed to meet its evidentiary burden for retention. We disagree. Miners' testimony, paired with the violence of Lu's alleged crimes, the escalation of his criminal behavior, his failed attempts at rehabilitation in juvenile probation, and his gang activity, support the district court's conclusion that Lu

requires detention and/or supervision extending into his adult-hood. This factor favors retention in the district court.

### (b) Factors Not Discussed by District Court

Based on our reading of the district court's order, the factors below were not discussed or contemplated within the order.

#### (i) § 43-276(1)(b)—Whether Alleged Offenses Included Violence

Lu's alleged offenses involve violence. He is charged with two counts of robbery, two counts of criminal conspiracy to commit robbery, and one count of use of a deadly weapon (firearm) to commit a felony. In each case, the victims were threatened with firearms. In the July 16, 2023, robbery, Lu was identified as the suspect who wielded the firearm. The victim stated that Lu activated the gun's laser and pointed it at his chest. The seriousness of the threat to life cannot be understated. This factor weighs in favor of retention in the district court.

#### (ii) § 43-276(1)(c)—Motivation for Commission of Offenses

The objective for these offenses was to rob seemingly random individuals of their money, property, and vehicles. Thus, the primary motivation appears to be financial. A reading of the police reports also reveals a thrill-seeking motive in that the stolen vehicles were driven recklessly, then abandoned. This factor weighs in favor of retention in the district court.

#### (iii) § 43-276(1)(h)—Juvenile's Ability to Appreciate Nature and Seriousness of Conduct

The evidence established that following the commission of his offenses, Lu has demonstrated an appreciation for the nature and seriousness of his conduct. Bergman testified that Lu was remorseful and understood the potential implications his actions could have on his future. However, the evidence

also shows that Lu has an established pattern of being adjudicated, participating in juvenile probation services, and then committing new crimes. This suggests that despite his appreciation, Lu is unable or unwilling to lead a law-abiding life once he becomes unconstrained by a structured environment. It is unknown at this point in time whether the current services that are being supplied to Lu will be sufficient to fully rehabilitate him. Thus, this factor, to some degree, weighs in favor of retention in the district court.

### (iv) § 43-276(1)(j)—Restorative Justice

No evidence was presented regarding whether the victim had agreed to participate in restorative justice. Therefore, this factor weighs in favor of transfer to the juvenile court.

### (v) § 43-276(1)(k)—Pretrial Diversion Program

No evidence was presented regarding available pretrial diversion programs. Therefore, this factor weighs in favor of transfer to the juvenile court.

### (vi) § 43-276(1)(l)—Whether Juvenile Has Acknowledged or Been Convicted of Unauthorized Use or Possession of Firearm

Lu was adjudicated for unlawful possession of a handgun in 2021. Both present offenses involved armed robbery with the use of a firearm. In one of the cases, Lu was identified as the suspect wielding the firearm. Several photographs and videos depict Lu carrying or firing a firearm in a reckless manner. This factor weighs in favor of retention in the district court.

### (vii) § 43-276(1)(m)—Whether Juvenile Court Order Has Been Issued for Juvenile Pursuant to § 43-2,106.03

No evidence was presented regarding whether a juvenile court order had been issued for Lu pursuant to Neb. Rev. Stat. § 43-2,106.03. (Reissue 2016). Therefore, this factor weighs in favor of transfer to the juvenile court.

### (viii) § 43-276(1)(n)—Whether Juvenile
### Is Criminal Street Gang Member

Lu informed Miners that he associated with a gang and has been identified by the police as a member of the Asian Boys Zone gang. After his release from Boys Town, he immediately returned to gang-related activities, which led to the present offenses. This factor weighs in favor of retention in the district court.

### (ix) § 43-276(1)(o)—Other Relevant Matters

Lu argues that the State originally filed these cases in juvenile court, dismissed them, and then refiled them in the district court without consulting the juvenile court, Boys Town, or Lu's probation officer. Lu asserts that this procedural history favors retention, but he fails to explain why or identify any authority that requires consultation prior to dismissal. We therefore do not consider this factor to be relevant to our determination.

Lu also argues that the potential immigration consequences he faces if his cases are retained in the district court should also be considered. We agree and address this issue more fully below. In short, this factor contributes to the consideration of Lu's best interests, as it would certainly not be in his best interests to be removed from the country. And we have already found that the factor concerning Lu's bests interests supports transfer to the juvenile court.

### (c) No Abuse of Discretion

[9] Out of the six factors the district court considered and deemed in favor of retention, we agree that five of those factors supported retention. The district court did not analyze the remaining statutory factors. However, our assessment of all of the statutory factors leads us to conclude that the district court did not abuse its discretion by overruling Lu's motion to transfer his cases to the juvenile court. We do not make this determination lightly. As we have often stated in our review

of juvenile transfer cases, these are difficult decisions for the trial court and for this court on appeal because of the young age of the defendants. However, a young age by itself does not support a transfer to the juvenile court. See *State v. Esai P.*, 28 Neb. App. 226, 942 N.W.2d 416 (2020).

[10] Ultimately, having reviewed the district court's analysis of six statutory factors, and having independently reviewed the remaining factors, we conclude that the district court did not abuse its discretion in refusing to transfer these cases to juvenile court. Based on Lu's age, the treatment Lu would be most amenable to, Lu's unsuccessful history with past juvenile probation services, considerations of public safety, and the likelihood of Lu's requiring secure detention or supervision beyond his minority, the district court concluded that a sound basis existed to retain these cases. We agree with the court's assessment of these factors. We also find that five factors that the district court did not address favor retention. These include the serious and violent nature of the alleged offenses, Lu's repeated use or possession of firearms, and his affiliation with a criminal gang. When the district court's basis for retaining jurisdiction over a juvenile is supported by appropriate evidence, it cannot be said that the court abused its discretion in refusing to transfer the case to juvenile court. *State v. Leroux*, 26 Neb. App. 76, 916 N.W.2d 903 (2018). Therefore, because there was ample evidence supporting retention of these cases in the district court, we find no abuse of discretion in the district court's order denying Lu's request to transfer his cases to juvenile court.

We do not seek to diminish or overlook Lu's success at Boys Town. The progress and achievements he has made there are commendable. Although we have determined that the district court's decision to retain jurisdiction was not an abuse of discretion, moving forward with his cases in the district court, Lu may still request disposition under the juvenile code. Neb. Rev. Stat. § 29-2204(5) (Cum. Supp. 2022) states:

Except when a term of life is required by law, whenever the defendant was under eighteen years of age at the time he or she committed the crime for which he or she was convicted, the court may, in its discretion, instead of imposing the penalty provided for the crime, make such disposition of the defendant as the court deems proper under the Nebraska Juvenile Code.

Lu was under the age of 18 when he allegedly committed these crimes, and none of his present charges require a life sentence. Thus, even though his cases will remain in the district court, Lu is eligible for disposition under the juvenile code. If Lu is convicted, at the time of sentencing, the district court, in its discretion, will be able to consider this course of action. The court can consider whether an alternative disposition is appropriate in light of Lu's progress or lack thereof during the time that passes prior to sentencing.

## 5. EVIDENTIARY RULINGS

On appeal, Lu assigns that the district court abused its discretion by failing to consider exhibits 36 and 37.

[11,12] As we have explained above, § 29-1816(3)(a) states that the customary rules of evidence do not apply in juvenile transfer hearings. Further, the statute states that the district court must consider all the evidence and reasons presented by both parties before issuing its ruling. In a case where the district court declined to review and consider certain police reports offered by the State, the Supreme Court concluded that that the district court had erred. See *State v. Tyler P.*, 299 Neb. 959, 911 N.W.2d 260 (2018). However, the court also noted that our harmless error jurisprudence recognizes that an error is only prejudicial and requires reversal when, in light of the totality of the record, the error influenced the outcome of the case. See *id.*

Exhibit 36 is an affidavit from an assistant public defender regarding immigration law. The public defender states that Lu could face potential immigration consequences, including

removal from the country, if he were convicted of robbery or conspiracy to commit robbery. As stated above, this information is relevant to Lu's best interests, as it would certainly be against his best interests to be removed from the country. However, we are unsure why Lu chose to present this information in this manner. A lawyer's opinion regarding an aspect of the law appears to be more of an argument than evidence. The evidence established that Lu was not a citizen of the United States. Thus, counsel could have simply cited the appropriate federal statutes and authorities for their position. Nonetheless, to the degree that rejection of the affidavit was error, the error was harmless. We have already concluded that the district court erred in finding that Lu's best interests favored retention. We found that Lu's best interests favored transfer, and yet, we concluded that even with this shift in the balancing test, the district court did not err in retaining the cases. Therefore, even if the court had received exhibit 36, it would not have affected the outcome of the motion.

Regarding exhibit 37, we conclude that the district court did not err in declining to receive this exhibit. Exhibit 37 is a deposition taken of Conoley in a separate case in 2014 concerning child brain development and its application to that case. Although it is true that the standard rules of evidence do not apply in juvenile transfer hearings, the district court may still rule on evidentiary objections. The State objected to this exhibit, arguing that the deposition was dated, that the State had no basis to determine whether the information contained in the deposition was still accurate, and that the deposition was not specific to this case. Based on this reasoning, the district court sustained the objection. We find no abuse of discretion in the district court's ruling. The deposition was not particular to Lu or his cases, and there was no evidence that Conoley's past testimony reflected current research or was still reliable. Thus, the district court did not err when it sustained the objections to exhibit 37.

## VI. CONCLUSION

For all the reasons stated herein, we affirm the decision of the district court denying Lu's motions to transfer these matters to the juvenile court.

Affirmed.