Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
02/06/2026 08:08 AM CST

IN RE INTEREST OF AADEN S., A CHILD
UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE, V.
AADEN S., APPELLANT.

___ N.W.3d ___

Filed February 6, 2026.    No. S-24-947.

1. **Constitutional Law: Due Process.** The determination of whether the procedures afforded to an individual comport with constitutional requirements for due process presents a question of law.
2. **Judgments: Appeal and Error.** An appellate court independently reviews questions of law decided by a lower court.
3. **Courts: Juvenile Courts: Jurisdiction: Appeal and Error.** An appellate court reviews a juvenile court's decision to transfer a juvenile offender's case to county court or district court de novo on the record for an abuse of discretion.
4. **Constitutional Law: Due Process.** The U.S. and Nebraska Constitutions provide that no person shall be deprived of life, liberty, or property without due process of law.
5. **Due Process.** The concept of due process defies precise definition but embodies the notion of fundamental fairness.
6. ____. Due process is flexible and calls for such procedural protections as the particular situation demands.
7. **Juvenile Courts.** The object of the Nebraska Juvenile Code is corrective, to the end that the child's reformation be brought about.
8. ____. A juvenile proceeding is not a prosecution for a crime but a special proceeding that serves as an ameliorative alternative to a criminal prosecution.
9. **Parental Rights: Rules of Evidence: Due Process.** While the Nebraska Evidence Rules do not apply in juvenile proceedings, the basic requirements of due process oblige a court to consider the type of evidence

used by the State in order to determine the weight to be given to that evidence.

10. **Rules of Evidence.** Authentication is governed by Neb. Rev. Stat. § 27-901 (Reissue 2016) of the Nebraska Evidence Rules and does not impose a high hurdle for admissibility.

11. ____. Authentication is often satisfied by testimony that a matter is what it is claimed to be, but proper authentication may also be attained by evidence of appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances, sufficient to support a finding that the matter in question is what it is claimed to be.

12. **Courts: Juvenile Courts: Jurisdiction.** In determining whether a case should be transferred to criminal court, the juvenile court need not resolve every factor against the juvenile, and there are no weighted factors and no prescribed method by which more or less weight is assigned to a specific factor. Rather, the court must engage in a balancing test by which public protection and societal security are weighed against the practical and nonproblematic rehabilitation of the juvenile.

13. **Juvenile Courts: Proof.** The State has the burden to prove, by a preponderance of the evidence, that a juvenile's case should transferred to adult court.

14. **Judgments: Words and Phrases.** An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.

Petition for further review from the Court of Appeals, Riedmann, Chief Judge, and Pirtle and Arterburn, Judges, on appeal thereto from the County Court for Buffalo County, John P. Rademacher, Judge. Judgment of Court of Appeals affirmed.

Charles D. Brewster, of Klein, Brewster, Brandt & Messersmith, for appellant.

Marti S. Sleister, Deputy Buffalo County Attorney, for appellee.

Funke, C.J., Cassel, Stacy, Papik, Freudenberg, Bergevin, and Vaughn, JJ.

Freudenberg, J.

## INTRODUCTION

This case concerns the question of what process is due to a juvenile facing transfer of his case from the juvenile docket to the adult docket of the county court. At the hearing on the State's motion to transfer, the only evidence offered by the State was several exhibits that had been previously provided to the juvenile's attorney and described by the deputy county attorney at the hearing as "Exhibits 4 through 19," and contained "photos, the police reports, and the video from the [child advocacy center] interview." The State provided neither witness nor affidavit to support, identify, or authenticate any of the exhibits. The juvenile court overruled the juvenile's attorney's objections to the evidence based on due process, authentication, foundation, and confrontation and granted the State's motion to transfer the juvenile's case to the county court. The juvenile appealed. The Nebraska Court of Appeals, in a split opinion, affirmed the juvenile court's decision, finding the juvenile's rights to due process were not violated and the juvenile court did not abuse its discretion in transferring the juvenile's case. The juvenile petitioned for further review on both issues, which we granted. We affirm under the specific facts of this case.

## BACKGROUND

Aaden S. is a minor. In September 2024, a juvenile petition was filed against Aaden in the Buffalo County Court alleging the offenses of (1) first degree sexual assault, a Class II felony; (2) terroristic threats, a Class IIIA felony; (3) assault by strangulation or suffocation, a Class IIIA felony; and (4) third degree domestic assault, a Class I misdemeanor. The allegations against Aaden stem from two August 2024 incidents in the area of Kearney, Nebraska, that involved Aaden's then-girlfriend, J.Z., who was 18 years old at the time. Aaden was 16 years old at the time of the incidents.

Motion to Transfer Hearing

The State moved to transfer Aaden's case from the juvenile court to the adult docket of the county court. After Aaden's counsel moved for and obtained a continuance to allow for the completion of an evaluation of Aaden, a hearing on the State's motion to transfer was held.

At the hearing, Aaden was present and represented by counsel. At the outset of the hearing, counsel for the State generally stated, "I have evidence in terms of both photos, the police reports, and the video from the [child advocacy center] interview." The State then offered "Exhibits 4 through 19." Counsel for the State explained that Aaden's counsel had previously received copies of the State's exhibits, which was not disputed by Aaden's counsel. The State did not offer any witnesses at the hearing to support its evidence or to testify as to whether Aaden's case should be transferred.

The State's exhibits contained what appear to be (1) undated and unmarked photographs of scratches and bruises on various parts of J.Z.'s body, (2) undated screenshots of text messages apparently between Aaden and J.Z. where Aaden attempted to coerce J.Z. into not talking to the authorities about what had happened between them, (3) police reports, and (4) a video recording of an interview of J.Z. conducted by the Family Advocacy Network (FAN).

The photographs lacked any identifying labels other than exhibit stickers. One of the police reports refers to J.Z.'s sending an investigating officer photographs of injuries she sustained. The screenshots of text messages show a few texts where Aaden and J.Z. use each other's names. Although the screenshots indicate the phone numbers from which the text messages were sent and received, Aaden's and J.Z.'s phone numbers were not established or identified.

In the FAN interview, J.Z. identified herself, discussed her relationship with Aaden, and recounted the events that eventually led to Aaden's arrest. J.Z. described the injuries she sustained and the photographs she took of her injuries after

the fact. J.Z. described some of the text messages depicted in the screenshots from exhibits 10 through 13, including one specific text from Aaden saying, "[I] will get my fucking hands on you . . . ."

Aaden's counsel objected to the admission of the State's exhibits on due process grounds, authentication, foundation, and the right to confrontation. Following the objections, Aaden's counsel and the juvenile court had a brief discussion about the right to confrontation and due process and how those rights relate to the court's accepting evidence at a juvenile transfer hearing. The discussion centered around the ability of Aaden's counsel to refute the State's evidence. The court expressed doubt that the Sixth Amendment right to confrontation applies in a transfer hearing. Aaden's counsel responded that juveniles are entitled to due process of law in juvenile court regardless of the applicability of the right to confrontation. Aaden's counsel also expressed concern that he could not "cross examine anything about those photographs or anything else that's up there in your stack of exhibits."

When the juvenile court pointed out that the formal rules of evidence are not applicable in a juvenile transfer hearing, Aaden's counsel reiterated that there was still a right to due process. The court responded that Aaden had notice, a hearing, an attorney, the opportunity to present evidence, and the opportunity to refute evidence. On the last point, Aaden's counsel again pointed out there was no opportunity to challenge the evidence by cross-examination and stated, "I think that's pretty critical."

The juvenile court overruled the objections and received exhibits 4 through 19, "unless counsel can provide me some case law that says that the Court shouldn't receive the exhibits for due process reasons." However, the record does not reflect that Aaden's counsel submitted any such authority to the court. Aaden's counsel also did not call any witnesses regarding the authenticity and substance of the State's exhibits and did not request a continuance in order to subpoena any

witnesses involved in preparing the reports or investigating the case.

The allegations are set forth in (1) the police report detailing a Kearney police officer's interview with J.Z. on September 4, 2024; (2) the video recording of the FAN interview with J.Z. on September 11; and (3) the police report summarizing the FAN interview. We summarize these allegations as follows: On August 17, Aaden, who was 16 years old at the time, was with J.Z. at a party at a friend's house south of Kearney and was drinking alcohol. Aaden became upset with J.Z. and pushed her against a wall and spit in her face. They moved into a bedroom where Aaden continued to yell at J.Z. Aaden told J.Z. not to tell anyone at the party what had happened.

The two continued to fight before deciding to leave the party. When they decided to leave, Aaden again became angry with J.Z. when she suggested she should drive because Aaden had apparently consumed four shots of whiskey. Aaden then hit her on the back of the head a few times. J.Z. got in the backseat of the car, prompting Aaden to yell at her to get into the passenger seat, which she apparently did. Aaden hit J.Z. in the head again as they drove away. On the way home, Aaden was driving erratically. When J.Z. sat on the floor of the car out of fear, Aaden told her to sit in the seat or he would crash the car.

When they were almost to Aaden's house in Kearney, Aaden asked J.Z. "why she was a whore" and hit her several more times in the head and once across the face. It is unclear if this happened while Aaden was still driving. When they arrived at Aaden's house, J.Z. told Aaden she was going home, but Aaden refused to let her go. Aaden grabbed her by her neck to get her out of the car.

Once outside of the car, J.Z. tried to run away, but Aaden pulled her by her hair and punched her in the face. J.Z. tried to get away again, but Aaden again pulled her by her hair, punched her, and told her to get in the house. J.Z. said she tried to get away several more times, with similar results. J.Z.

explained that one of the times she attempted to get away, she saw a police cruiser. Aaden tackled her to the ground and threatened to kill her if she got back up. Aaden grabbed an area of J.Z.'s arm he knew contained her birth control device in order to cause her pain and keep her quiet until the police cruiser had passed.

After the police cruiser passed, the two ended up in a park across the street from Aaden's house. J.Z. again attempted to scream. Every time she screamed, Aaden hit her, with one blow resulting in a bloody nose.

The two began walking back to Aaden's house, and Aaden began to apologize. J.Z. again tried to run away, but Aaden tackled her. J.Z. believed this caused her to lose consciousness. When she awoke, Aaden told her she could leave but could not have her car keys or her phone. Apparently around this time, she saw on her phone a notification from her video doorbell camera that some people were at her house. This upset Aaden because there were "guys" at her house.

J.Z. tried to run again, but Aaden pushed her up against the garage door and told her to go inside. Inside his house, J.Z. attempted to wash off the blood but could not wash off the marks on her neck left by Aaden. She told Aaden she wanted to sleep alone, but he pushed her onto the bed and started taking her clothes off. She said no, but he continued. Aaden digitally penetrated her vagina. J.Z. reported that she "had sex with him to get him to stop." When Aaden fell asleep, J.Z. went and slept on the couch. The next day, Aaden would not let her leave until midafternoon when he had to leave for work. J.Z. reported that Aaden did not let her access her phone, other than to use it to inform her mother where she was.

The next incident occurred 8 days later, when J.Z. was at Aaden's house. Aaden had again been drinking. J.Z. asked Aaden if she was staying at his house, and he told her that she was. J.Z. then took her clothes off, but Aaden did not. The two laid together for a while before they started fighting. Aaden asked J.Z. if she wanted to have sex, and she responded she

did not want to. Aaden then asked if J.Z. would perform oral sex on him, and she responded she did not want to. Aaden then told J.Z. she "was going to do one or the other."

Aaden pulled out his penis, and J.Z. began performing oral sex but stopped. Aaden again asked her if she wanted to have sex, and she again said that she did not. Aaden then positioned J.Z. on her stomach and penetrated her vagina with his penis. J.Z. stated that she told him multiple times to stop and tried to move away from him, but he continued. At one point, Aaden apologized for hurting her but did not stop. When this ended, Aaden did not allow J.Z. to put her clothes back on. He tried to rip her underwear off her when she attempted to put it on.

The two got into a physical fight, and Aaden pushed her. J.Z. told him she was leaving. Aaden tried to grab her by the neck, and she screamed. When Aaden's father, who was home, inquired about what was happening, Aaden told him J.Z. was "being a bitch" and was leaving. When she walked outside to her car, he followed her and spit in her face.

After she left, Aaden "blew up" her phone. J.Z. stated that she and Aaden had limited communication after the second incident.

One of J.Z.'s friends reported the incidents to a school counselor in early September 2024, leading to an investigation, Aaden's arrest, and the filing of the juvenile petition charging Aaden with the offenses listed above.

Aaden's counsel called as a witness Tyler Mertens, a specialized juvenile probation officer assigned to Aaden, to support Aaden's position that transfer was not appropriate. Mertens testified that Aaden was cooperative, polite, and respectful in his interactions with Mertens. Mertens explained the process of the intake summary and risk assessment inventory forms he had completed for Aaden, which were identified as exhibit 3. Through Mertens, Aaden's counsel offered and the court accepted exhibit 3 into evidence.

Mertens testified that Aaden had been held in a juvenile detention center for about 3 weeks and had no negative reports. During Aaden's time at the juvenile detention center, he underwent an evaluation consisting of both a drug and alcohol evaluation and a mental health evaluation. Aaden's counsel also offered exhibit 21, the evaluation report on Aaden, which the court received over the State's objection.

Mertens explained that, upon release from the juvenile detention center, Aaden submitted to outpatient counseling, was fitted with an electronic monitoring device, submitted to drug testing, resumed attending school, was subjected to an 8 p.m. curfew, and met with probation services regularly. Mertens testified that Aaden tested positive for "THC" on his first drug test but was negative on his subsequent tests. Mertens testified that Aaden had been doing well, had adjusted well to outpatient treatment services, and would benefit from probation.

Counsel for the State then cross-examined Mertens. The State's cross-examination centered on Mertens' lack of information regarding the allegations contained in the police reports and J.Z.'s FAN interview and how that lack of information may have impacted his evaluation and testimony. On redirect examination, Mertens explained that reading police reports is not generally standard procedure in his work. Mertens further explained that he was aware of the charges against Aaden when he conducted his assessment.

At the end of the hearing, the juvenile court and the attorneys agreed to forgo oral arguments in favor of written arguments. The record does not indicate whether written arguments were received or considered by the court. The court then took the matter under advisement.

### Order on Transfer

The court issued a written order granting the State's motion to transfer Aaden's case from the jurisdiction of the juvenile court. The court examined the evidence presented by both

parties in the context of the factors enumerated in Neb. Rev. Stat. § 43-276(1) (Cum. Supp. 2024).

Based on the evidence presented, the court found the first factor, the type of treatment a juvenile would be most amenable to, weighed in favor of the juvenile court's retaining jurisdiction. The court relied on exhibit 21—the evaluation report—and the testimony of Mertens in making this finding.

The second factor, whether there was evidence that the alleged offense included violence, was found to weigh heavily in favor of transfer. The court relied on J.Z.'s descriptions of the events in making this finding.

The court found the third factor, the motivation for the commission of the offense, weighed heavily in favor of transfer. The court described Aaden's motivations as being sexual in nature and exercising dominance and control over J.Z.

The court found the fourth factor, the age of a juvenile and the ages and circumstances of others involved in the offense, weighed heavily in favor of transfer. The court noted Aaden was 16 years old at the time of the alleged offenses and was 17 years old at the time of the hearing. Because Aaden would have fewer than 2 years of juvenile rehabilitative services, the court found that to be an insufficient amount of time to treat and supervise him. The court discredited Mertens' testimony on this point, stating that Mertens had limited information regarding the allegations against Aaden.

The fifth factor, the previous criminal history of a juvenile, weighed strongly in favor of retention in the juvenile court. In making this finding, the court relied on the testimony of Mertens that he was not aware of any prior juvenile adjudications of Aaden, as well as no evidence of previous convictions having been presented.

The best interests of a juvenile, the sixth factor, weighed in favor of retention in the juvenile court. Here again, the court noted Aaden's lack of prior court involvement. The court also mentioned the potential repercussions of felony convictions on Aaden's life.

The court found the seventh factor, the consideration of public safety, favored transfer. The court stated that the allegations against Aaden were serious and involved violence. The court disagreed with Mertens' testimony that Aaden did not present public safety concerns. The court relied on exhibits 10 through 13, which purported to show text messages where Aaden threatened J.Z., as well as exhibit 3, which contained the beliefs of a Kearney police officer regarding Aaden and an intake screening risk assessment where Aaden scored a "12"—meaning he needed "Secure Detention."

The eighth factor, the consideration of a juvenile's ability to appreciate the nature and seriousness of his or her conduct, was also found to favor transfer. The court again noted exhibit 13, where Aaden purportedly attempted to persuade J.Z. over text message to not cooperate with police. Mertens' testimony that Aaden did not want to go back to detention and wished to change was also considered for this factor.

The court found that the ninth factor, whether the best interests of a juvenile and the security of the public may require that the juvenile continue in secure detention or under supervision for a period extending beyond his or her minority, favored transfer. The court based this determination on Aaden's apparent attempts to manipulate J.Z., the violent nature of his alleged crimes, and his age.

The 10th factor, whether a victim or juvenile agree to participate in restorative justice, favored transfer because Aaden was ordered to have no contact with J.Z. during the pendency of the proceedings and she was unwilling to see Aaden.

Because no evidence was presented on the 11th factor, whether there is a juvenile pretrial diversion program, the court found it weighed in favor of retention in the juvenile court. The same was true of the 12th factor, whether a juvenile has been convicted of or has acknowledged unauthorized use or possession of a firearm, and the 13th factor, whether a juvenile court order has been issued for the juvenile. With regard to the 14th factor, whether a juvenile is a criminal

street gang member, there was no evidence presented that Aaden was a gang member. As such, the court found the 14th factor favored retention.

Finally, the court found the 15th factor, such other matters as the parties deem relevant to aid in the decision, favored transfer. The court noted, under this catchall factor, that Aaden's parents told Mertens that Aaden "gets angry when he is treated like a child because he thinks of himself as an adult." The court also highlighted that Aaden engaged in the "adult activity" of consuming alcohol, including during the alleged events giving rise to this case.

Based on its consideration of these factors, the court found the State had met its burden by a preponderance of the evidence that Aaden's case should be transferred to adult court and, as such, granted the State's motion to transfer. Aaden appealed to the Court of Appeals.

## Court of Appeals

The Court of Appeals consolidated Aaden's seven assignments of error into the following two assignments of error: (1) the juvenile court violated his rights to confrontation and due process by receiving evidence without requiring the State to call any witnesses and (2) the juvenile court abused its discretion in determining that his case should be transferred to the adult docket of the county court. In a split opinion, the Court of Appeals affirmed the transfer of Aaden's case.[1]

The Court of Appeals first took up Aaden's arguments on the juvenile court's violations of his rights to confrontation and due process by receiving all of the State's evidence without requiring the State to call any witnesses or otherwise authenticate the evidence. The court noted that the right to confrontation is generally not applicable to juvenile transfer hearings, as held by this court in *In re Interest of Brian B. et al.*[2] As such,

---

[1] See *In re Interest of Aaden S.*, 33 Neb. App. 777, 25 N.W.3d 480 (2025).

[2] See *In re Interest of Brian B. et al.*, 268 Neb. 870, 689 N.W.2d 184 (2004).

the court turned its attention to whether Aaden's due process rights were violated.

The Court of Appeals discussed and relied on the U.S. Supreme Court's decision in *Kent v. United States*,[3] where the Court laid out the three essential elements that must be present in a juvenile transfer proceeding to satisfy due process: a hearing, representation by counsel who is given an opportunity to function, and a decision by the juvenile court containing sufficient specificity to permit meaningful review. The Court of Appeals noted that none of our case law has considered the adequacy of the *Kent* due process requirements in juvenile transfer proceedings. As a result, the Court of Appeals turned to case law from other jurisdictions, which it found had largely declined to afford juveniles with greater due process protections than those outlined in *Kent*, specifically as it related to the right of confrontation.

The Court of Appeals then discussed our recent decision in *State v. Jeremiah T.*,[4] where the State similarly introduced evidence at a juvenile transfer hearing without any sponsoring witnesses to authenticate the evidence. The court acknowledged that this practice was not raised in that appeal but found it significant that we did not engage in a plain error analysis disapproving of the practice.

The Court of Appeals found that Aaden's due process rights under *Kent* were satisfied, even if it agreed the State's approach "may not be the best practice in terms of creating a clear and complete record for both the trial court and an appellate court on review."[5] The court found Aaden was given a hearing, was represented by counsel at the hearing, and the juvenile court issued a written opinion containing the reasons for granting the

---

[3] See *Kent v. United States*, 383 U.S. 541, 86 S. Ct. 1045, 16 L. Ed. 2d 84 (1966).

[4] *State v. Jeremiah T.*, 319 Neb. 133, 21 N.W.3d 313 (2025).

[5] See *In re Interest of Aaden S., supra* note 1, 33 Neb. App. at 790, 25 N.W.3d at 494.

State's motion to transfer. The court stated that Aaden's counsel could have called any witness named in the police reports or portrayed in the photographs or video recording received by the juvenile court at the hearing. The Court of Appeals determined Aaden's due process and confrontation rights were not violated by the State's offering, and the juvenile court's receiving, exhibits without authentication and without supporting witness testimony.

The Court of Appeals then turned to the factors set forth in § 43-276(1). It found the following factors favored transfer of Aaden's case to the adult court: (1) the violent and sexual nature of the alleged crimes, (2) the motivation of the alleged crimes, (3) Aaden's age, (4) his ability to understand the seriousness and wrongfulness of the alleged crimes, (5) the perceived inability to rehabilitate him in the time before he reaches the age of majority, (6) the security of the public, (7) the inability to engage in restorative justice, and (8) Aaden's consideration of himself as an adult and engagement in adult-like activities.

The Court of Appeals also found several factors that weighed against transfer or on which no evidence was presented, which must weigh against transfer: (1) Aaden's best interests, (2) his amenability to treatment, (3) his lack of a prior criminal history, (4) conviction for or unauthorized use of a firearm, (5) involvement with a criminal street gang, (6) participation in juvenile pretrial diversion program, and (7) no juvenile court order issued for him under Neb. Rev. Stat. § 43-2,106.03 (Reissue 2016).

The Court of Appeals ultimately found the juvenile court did not abuse its discretion by granting the State's motion to transfer. The Court of Appeals therefore affirmed the transfer of Aaden's case.

Chief Judge Riedmann authored a dissenting opinion that took issue with the State's presentation of evidence at Aaden's hearing, particularly with the lack of authentication or sponsoring witness to identify the exhibits offered into evidence.

While the rules of evidence do not apply in juvenile proceedings, Chief Judge Riedmann cited *In re Interest of Aaron D.*,[6] where we explained that the basic requirements of due process oblige a court to consider the type of evidence used by the State in order to determine the weight to be given to that evidence.

Chief Judge Riedmann pointed out that in all the cases cited by the majority, the State had offered testimony to support its evidence, even if such testimony was hearsay. A common theme from other jurisdictions' case law is whether the evidence has indicia of trustworthiness or reliability, Chief Judge Riedmann explained. Where, as here, the State offered multiple exhibits without authentication, foundation, or any sponsoring witness, Chief Judge Riedmann concluded that Aaden's hearing did not live up to the essentials of due process and fair treatment as required by the U.S. Supreme Court in *Kent*.

Turning to the juvenile court's determination that Aaden's case should be transferred, Chief Judge Riedmann explained she would have found the juvenile court abused its discretion. The dissenting opinion took particular issue with the juvenile court's finding on the factor of whether Aaden could be rehabilitated before reaching the age of majority. The only evidence presented on this factor, Chief Judge Riedmann explained, was the testimony of Mertens, who testified that juvenile supervision would be best for Aaden. Furthermore, Chief Judge Riedmann took issue with the juvenile court's perceived reliance on the seriousness-of-the-crimes factor in determining Aaden's case should be transferred, opining that focusing on that factor improperly alleviated the State's burden imposed by statute.

Pursuant to Neb. Rev. Stat. § 24-1107 (Reissue 2016) and Neb. Ct. R. App. P. § 2-102(F) (rev. 2022), Aaden petitioned this court for further review, which we granted.

---

[6] *In re Interest of Aaron D.*, 269 Neb. 249, 691 N.W.2d 164 (2005).

## ASSIGNMENTS OF ERROR

On further review, Aaden assigns the Court of Appeals erred (1) by finding Aaden's rights to due process of law were not violated by the juvenile court when it received materials offered by the State as evidence without any identification or authentication of those materials; (2) by not finding Aaden's right to counsel was violated due to his attorney's inability to contest the State's evidence by cross-examination of witnesses of the State, as those witnesses did not exist at the transfer hearing; and (3) by affirming the juvenile court's finding that Aaden was not amenable to rehabilitative services and doing so without having any evidence from the State to support this conclusion.

## STANDARD OF REVIEW

[1,2] The determination of whether the procedures afforded to an individual comport with constitutional requirements for due process presents a question of law.[7] An appellate court independently reviews questions of law decided by a lower court.[8]

[3] An appellate court reviews a juvenile court's decision to transfer a juvenile offender's case to county court or district court de novo on the record for an abuse of discretion.[9]

## ANALYSIS

### Due Process of Law

As a threshold matter, we first address whether Aaden's juvenile transfer hearing measured up to the minimum protections of due process and fair treatment when the State offered, and the court received, "Exhibits 4 through 19" into evidence without calling any witnesses or authenticating the exhibits. Aaden argues his due process rights were violated because

---

[7] *In re Interest of A.A. et al.*, 307 Neb. 817, 951 N.W.2d 144 (2020), *supplemented by* 308 Neb. 749, 957 N.W.2d 138 (2021).

[8] *In re Interest of Jordon B.*, 316 Neb. 974, 7 N.W.3d 894 (2024).

[9] *In re Interest of Steven S.*, 299 Neb. 447, 908 N.W.2d 391 (2018).

the evidence admitted in support of transfer lacked indicia of reliability and provided no means for his counsel to cross-examine or otherwise challenge the evidence against him. What manner of evidence meets due process requirements in a juvenile transfer hearing is a question of first impression for this court.

[4-6] The U.S. and Nebraska Constitutions provide that no person shall be deprived of life, liberty, or property without due process of law.[10] The U.S. Supreme Court has said, and we have reiterated, that "[d]ue process of law is the primary and indispensable foundation of individual freedom. It is the basic and essential term in the social compact which defines the rights of the individual and delimits the powers which the state may exercise."[11] We have said the concept of due process defies precise definition but embodies the notion of fundamental fairness.[12] Due process is flexible and calls for such procedural protections as the particular situation demands.[13]

We have recognized that juvenile court hearings must measure up to the essentials of due process and fair treatment.[14] Accordingly, the hearing to determine whether to deprive a juvenile of the statutory protections of the juvenile court must be "fundamentally fair" to satisfy minimum standards of due process.[15]

The U.S. Supreme Court has held that under the flexible requirements of due process, what is fundamentally fair

---

[10] *In re Interest of Jordon B., supra* note 8. See, also, U.S. Const. amend. XIV, § 1; Neb. Const. art. I, § 3.

[11] *In re Gault*, 387 U.S. 1, 20, 87 S. Ct. 1428, 18 L. Ed. 2d 527 (1967). See, also, *In re Interest of A.A. et al., supra* note 7.

[12] See, *In re Interest of A.A. et al., supra* note 7; *D.W. v. A.G.*, 303 Neb. 42, 926 N.W.2d 651 (2019).

[13] *In re Interest of A.A. et al., supra* note 7. See, also, *Mathews v. Eldridge*, 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976).

[14] See *In re Interest of Leo L.*, 258 Neb. 877, 606 N.W.2d 783 (2000). See, also, Neb. Rev. Stat. § 43-246(3) (Cum. Supp. 2024).

[15] See *Kent v. United States, supra* note 3.

depends on the nature of the private interest at stake and the weight of that interest balanced against the opposing governmental interests.[16] In *Mathews v. Eldridge*,[17] the U.S. Supreme Court laid out three distinct factors to consider when identifying the "specific dictates of due process." First, consider the private interest that will be affected by the State's action.[18] Second, consider the "risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards."[19] Third, consider the State's interest, "including the function involved and . . . administrative burdens that the additional or substitute procedural requirement would entail."[20]

[7,8] The purpose and statutory structure of the Nebraska Juvenile Code recognizes the critical importance of both the juvenile's and the State's interest in providing the protections of the juvenile court where appropriate.[21] A key goal of the Nebraska Juvenile Code, concurrent with the responsibility to "preserve the public peace and security," is to "remove juveniles who are within the Nebraska Juvenile Code from the criminal justice system whenever possible and to reduce the possibility of their committing future law violations through the provision of social and rehabilitative services to such juveniles and their families."[22] We have long held that the object of the juvenile code is corrective, to the end that the child's reformation be brought about,[23] and we have observed that a juvenile proceeding is not a prosecution for a crime but

---

[16] See *Mathews v. Eldridge, supra* note 13.

[17] *Id.*, 424 U.S. at 335.

[18] See *id.*

[19] *Id.*

[20] *Id.*

[21] See Neb. Rev. Stat. §§ 43-245 to 43-2,129 (Reissue 2016, Cum. Supp. 2024, & Supp. 2025).

[22] See § 43-246.

[23] *In re Interest of Steven S., supra* note 9.

a special proceeding that serves as an ameliorative alternative to a criminal prosecution.[24]

The purpose of our statutes relating to youthful offenders is the education, treatment, and rehabilitation of the child.[25] The juvenile code expounds upon these purposes at length, and the codification of the relatively recent changes allocating jurisdiction between juvenile and adult courts illustrates the Legislature's goal of favoring juvenile courts as forums for criminal offenses committed by minor children.[26]

If a case is transferred to the county or district court under § 43-274(5)(a), a juvenile has a right to appeal the decision to the Court of Appeals.[27] Once a case is transferred to the county or district court, a juvenile is subject to the full consequences of the criminal justice system.[28]

That said, we have also recognized the need for flexibility in conducting the appropriate balancing test to ensure public protection and societal security are weighed against the practical and nonproblematic rehabilitation of a juvenile. As we have held in other contexts, a hearing of this nature should be flexible enough to consider evidence that would not be admissible in an adversary criminal trial.[29]

The U.S. Supreme Court, in *Kent*, made it clear that the question of whether to deprive a juvenile of the protections of

---

[24] See *id.*

[25] *Id.*

[26] See *id.* (citing §§ 43-246 and 43-246.01).

[27] See § 43-274(5)(b).

[28] See § 43-274(5)(c). See, also, Neb. Rev. Stat. § 29-2204.02(6) (Reissue 2016) ("[i]f the defendant was under eighteen years of age at the time he or she committed the crime for which he or she was convicted, the court may, in its discretion, instead of imposing the penalty provided for the crime, make such disposition of the defendant as the court deems proper under the Nebraska Juvenile Code").

[29] *State v. Johnson*, 287 Neb. 190, 842 N.W.2d 63 (2014) (probation revocation hearing).

the juvenile court is a "'critically important'" one,[30] while also recognizing the need for flexibility in the proceedings. As a result, the Court in *Kent* established certain minimal due process protections for juvenile transfer hearings when it held that the juvenile court in that case violated due process by transferring a juvenile's case to adult court without a hearing and upon an order that failed to give reasons sufficient to permit meaningful review.

The U.S. Supreme Court explained that juvenile courts, while given considerable latitude, should exercise "procedural regularity sufficient in the particular circumstances to satisfy the basic requirements of due process and fairness."[31] And "there is no place in our system of law for reaching a result of such tremendous consequences without ceremony—without hearing, without effective assistance of counsel, without a statement of reasons."[32]

Although the State acts as parens patriae, rather than prosecuting attorney and judge, "the admonition to function in a 'parental' relationship," said the Court, "is not an invitation to procedural arbitrariness."[33] Indeed, the Court expressed concern that in a transfer hearing, without procedural safeguards, "the child receives the worst of both worlds: that [the child] gets neither the protections afforded to adults nor the solicitous care and regenerative treatment postulated for children."[34]

Elaborating on the necessary ceremony, the U.S. Supreme Court held that the lower court must accompany its transfer or waiver order with a "statement of the reasons" sufficient to permit meaningful review.[35] And, before such order, there

---

[30] *Kent v. United States, supra* note 3, 383 U.S. at 556.

[31] *Id.*, 383 U.S. at 553.

[32] *Id*., 383 U.S. at 554.

[33] *Id*., 383 U.S. at 555.

[34] See *id*., 383 U.S. at 556.

[35] *Id*., 383 U.S. at 561.

must be a hearing that "measure[s] up to the essentials of due process and fair treatment,"[36] even if it may be informal.

The Court focused at length on the right to counsel at such a hearing. The Court held that the juvenile's counsel must be "given an opportunity to function."[37] The Court characterized the juvenile's right to counsel in this context as "the essence of justice," which must include access to the government's evidence supporting trial of the juvenile in adult court.[38] The Court said:

The right to representation by counsel is not a formality. It is not a grudging gesture to a ritualistic requirement. It is of the essence of justice. Appointment of counsel without affording an opportunity for hearing on a "critically important" decision is tantamount to denial of counsel.[39]

In *Kent*, the evidence on which the trial court based its transfer decision was not made available to the juvenile's counsel. The Court thus explained that counsel's opportunity to function is not limited to presenting evidence or arguments to the court on behalf of the child.[40] Counsel must also have the ability to challenge the State's evidence. The Court said, "[I]t is precisely the role of counsel to 'denigrate'" the State's evidence.[41] The Court accordingly held that the juvenile's counsel was entitled to see the juvenile's social records that the court might have relied upon in making its decision.[42] However, because in the case before it there was no hearing at all, the Court did not address the necessary qualities of the State's evidence proffered at a hearing or the manner of its admission.

---

[36] *Id.*, 383 U.S. at 562.

[37] *Id.*, 383 U.S. at 561.

[38] *Id.*

[39] *Id*.

[40] See *Kent v. United States, supra* note 3.

[41] *Id.*, 383 U.S. at 563.

[42] See *Kent v. United States, supra* note 3.

Our juvenile transfer statutes codified the three *Kent* due process requirements. First, Nebraska's juvenile transfer statutes require a hearing. Section 43-274(5)(a) provides, in relevant part, "The juvenile court shall schedule a hearing on such motion [to transfer] within fifteen days after the motion is filed. The county attorney or city attorney has the burden by a preponderance of the evidence to show why such proceeding should be transferred."[43] Second, Nebraska's juvenile transfer statutes require that the juvenile be represented by counsel. Section 43-274(5)(a) continues: "The juvenile shall be represented by counsel at the hearing and may present the evidence as to why the proceeding should be retained."[44] Third, Nebraska's juvenile transfer statutes require the court to "set forth findings for the reason for its decision."[45] After considering "all the evidence and reasons presented by both parties," as stated in § 43-274(5)(a), "the juvenile court shall retain the proceeding unless the court determines that a preponderance of the evidence shows that the proceeding should be transferred to the county court or district court."

[9] Our transfer statutes, however, do not address the quality and manner of the admission of the evidence that must support, by such preponderance of the evidence, transfer to the county or district court. In *In re Interest of Aaron D.*, we said that while the Nebraska Evidence Rules do not apply in juvenile proceedings, the basic requirements of due process oblige a court to consider the type of evidence used by the State in order to determine the weight to be given to that evidence.[46]

In our recent juvenile transfer cases, the parties have not raised due process issues, but we have discussed, at least briefly, the presentation of evidence at the transfer hearings. Summarized, our recent cases in which we have affirmed

---

[43] See, also, Neb. Rev. Stat. § 29-1816(3)(a) (Cum. Supp. 2024).

[44] See, also, *id.*

[45] See § 43-274(5)(a). See, also, § 29-1816(3)(b).

[46] *In re Interest of Aaron D., supra* note 6.

juvenile transfer to the county or district court involve the admission of self-authenticating evidence, in-court testimony subject to cross-examination that supports documentary evidence, or video evidence that supports documentary evidence.

For example, we have affirmed a case where the State has offered self-authenticating exhibits in the form of a probable cause affidavit and a certified copy of the juvenile's juvenile court file.[47] We have also affirmed, or reversed on other grounds, several cases where the State has offered sworn, in-court testimony subject to cross-examination in addition to documentary evidence.[48] This is true even when the in-court testimony is not based on personal knowledge.[49]

[10] The question remains whether the evidence in Aaden's hearing met these minimum due process standards. In answering this question, we look, as we have in similar proceedings,[50] to the Nebraska Evidence Rules as a guidepost. Though the rules of evidence are not strictly applicable,[51] we have explained they demonstrate "fairness" in various proceedings.[52] We therefore consider Aaden's objections to the State's evidence on authentication and foundation grounds—albeit under the

---

[47] *State v. Hunt*, 299 Neb. 573, 909 N.W.2d 363 (2018).

[48] See, e.g., *State v. Stevens*, 290 Neb. 460, 860 N.W.2d 717 (2015); *State v. Dominguez*, 290 Neb. 477, 860 N.W.2d 732 (2015); *State v. Tyler P.*, 299 Neb. 959, 911 N.W.2d 260 (2018); *State v. Aldana Cardenas*, 314 Neb. 544, 990 N.W.2d 915 (2023). See, also, *State v. Esai P.*, 28 Neb. App. 226, 942 N.W.2d 416 (2020); *State v. Lu*, 33 Neb. App. 45, 10 N.W.3d 382 (2024).

[49] See *State v. Stevens, supra* note 48 (testimony of probation officer's supervisor because probation officer was unavailable).

[50] See, *In re Interest of Floyd B.*, 254 Neb. 443, 577 N.W.2d 535 (1998) (protective custody hearings pending adjudication); *In re Interest of Destiny A. et al.*, 274 Neb. 713, 742 N.W.2d 758 (2007) (termination of parental rights hearings); *State v. Johnson, supra* note 29 (probation revocation hearing); *In re Interest of Ramon N.*, 18 Neb. App. 574, 789 N.W.2d 272 (2010) (dispositional review hearings).

[51] See § 29-1816(3)(a).

[52] See Neb. Rev. Stat. § 27-102 (Reissue 2016).

wider umbrella of due process. An objection on the grounds of foundation is a general objection that generally relies on a specific ground, such as authentication.[53] Authentication is governed by Neb. Rev. Stat. § 27-901 (Reissue 2016) of the Nebraska Evidence Rules and does not impose a high hurdle for admissibility.[54]

[11] Authentication is often satisfied by testimony that a matter is what it is claimed to be, but proper authentication may also be attained by evidence of appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances, sufficient to support a finding that the matter in question is what it is claimed to be.[55] Some evidence is "self-authenticating" as provided by Neb. Rev. Stat. § 27-902 (Cum. Supp. 2024) of the Nebraska Evidence Rules and thus does not require extrinsic evidence of authenticity to be admissible. Examples of self-authenticating evidence include copies of official court records,[56] an acknowledgment certified by a notary public such as an affidavit,[57] and documents bearing an official government seal.[58] No self-authenticating evidence pursuant to § 27-902 was offered in this matter.

Under the particular facts of this case, we hold that Aaden's due process rights were not violated. Both Aaden and the State were able to offer evidence and present arguments to the juvenile court. Aaden's counsel had access to the State's evidence beforehand. And the State's evidence was sufficiently reliable to be received and relied upon by the court. The video recording of J.Z.'s FAN interview supports and corroborates the information found in the police reports, the photographs,

---

[53] *State v. Harris*, 263 Neb. 331, 640 N.W.2d 24 (2002).

[54] See *VKGS v. Planet Bingo*, 309 Neb. 950, 962 N.W.2d 909 (2021).

[55] See *id.*

[56] See *State v. Hall*, 270 Neb. 669, 708 N.W.2d 209 (2005).

[57] See *State v. Jacobson*, 273 Neb. 289, 728 N.W.2d 613 (2007).

[58] See § 27-902(1).

and the screenshots of text messages appearing to be between Aaden and J.Z. J.Z.'s description of these documents provides support for their reliability sufficient to support a finding that they are what they purport to be. Notably, no one disputes that J.Z.'s FAN interview is in fact a video recording of J.Z. taken after the events at issue.

Therefore, the evidence offered and received at the transfer hearing was sufficiently authenticated and therefore met the minimum standards of due process. But we stress the blanket offer of documentary evidence by the State at a juvenile transfer hearing, without establishing foundation when such evidence is not self-authenticating, is not a recommended practice. Were it not for the video recording, the police reports, photographs, and screenshots of text messages entered by the State may not have been sufficient—standing on their own—to support a finding of reliability.

While cross-examination of witnesses is a common way of meaningfully contesting evidence, and we encourage the State to provide a witness at a transfer hearing, a witness is not absolutely required to satisfy due process in this context. Aaden's counsel was able to, and did, object to the State's evidence and make arguments as to why the juvenile court should not have received the State's evidence. Further, Aaden's counsel was given the opportunity to provide written arguments to the court as to why the court should not receive the exhibits for due process reasons, although it is unclear if Aaden's counsel did so. Aaden's counsel could have requested a continuance of the hearing in order to subpoena witnesses to question at the hearing and contest the State's evidence.

We caution the State that when it proffers non-self-authenticating exhibits without any identification, foundation, or sponsoring witness, the State runs the risk of failing to meet its burden of proof by leaving the weight of the evidence solely up to the judge's consideration. Further, the State opens itself up to due process challenges by not adequately establishing the reliability of its evidence at the transfer hearing.

The State must show that the exhibits it offers are what they purport to be. The burden is on the State to prove by a preponderance of the evidence that proceeding in the county or district court is warranted.

### DECISION TO TRANSFER AADEN'S CASE TO ADULT COURT

We turn to Aaden's argument that the Court of Appeals erred by affirming the juvenile court's finding that he was not amenable to rehabilitative services without evidence from the State to support this finding. Because Aaden was 16 years old when he allegedly committed an offense punishable as a Class II felony, the juvenile court had concurrent original jurisdiction with the county court or district court.[59] Stated another way, the action against Aaden could have been initiated either in the juvenile court or in the county or district court. Our statutory scheme allows the transfer of actions filed in the juvenile court to an adult court and vice versa.[60]

In making the "critically important" decision to transfer, the juvenile court must consider 15 factors set forth in § 43-276(1):

(a) The type of treatment such juvenile would most likely be amenable to; (b) whether there is evidence that the alleged offense included violence; (c) the motivation for the commission of the offense; (d) the age of the juvenile and the ages and circumstances of any others involved in the offense; (e) the previous history of the juvenile, including whether he or she had been convicted of any previous offenses or adjudicated in juvenile court; (f) the best interests of the juvenile; (g) consideration of public safety; (h) consideration of the juvenile's ability to appreciate the nature and seriousness of his or her conduct; (i) whether the best interests of the juvenile and the security of the public may require that the juvenile

---

[59] See, § 43-246.01(3)(a)(iii); § 29-1816(1)(a)(ii).

[60] See, § 43-274(5)(a); § 29-1816(2).

continue in secure detention or under supervision for a period extending beyond his or her minority and, if so, the available alternatives best suited to this purpose; (j) whether the victim or juvenile agree to participate in restorative justice; (k) whether there is a juvenile pretrial diversion program established pursuant to sections 43-260.02 to 43-260.07; (l) whether the juvenile has been convicted of or has acknowledged unauthorized use or possession of a firearm; (m) whether a juvenile court order has been issued for the juvenile pursuant to section 43-2,106.03; (n) whether the juvenile is a criminal street gang member; and (o) such other matters as the parties deem relevant to aid in the decision.

[12,13] In determining whether a case should be transferred to criminal court, the juvenile court need not resolve every factor against the juvenile, and there are no weighted factors and no prescribed method by which more or less weight is assigned to a specific factor.[61] Rather, the court must engage in a balancing test by which public protection and societal security are weighed against the practical and nonproblematic rehabilitation of the juvenile.[62] Retention of the case in juvenile court is favored. The State has the burden to prove, by a preponderance of the evidence, that a juvenile's case should transferred to adult court.[63]

[14] We review the determination of whether a juvenile's case should be transferred de novo on the record for an abuse of discretion.[64] An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.[65]

---

[61] See *In re Interest of Steven S., supra* note 9.

[62] *Id.*

[63] See § 43-274(5)(a).

[64] See *In re Interest of Steven S., supra* note 9.

[65] *State v. Aldana Cardenas, supra* note 48.

The juvenile court found that the amenability to treatment factor weighed in favor of retention at the juvenile court. Nonetheless, it found that the remaining factors weighed in favor of transferring Aaden's case to the adult docket of the county court. The juvenile court highlighted the violence and motivation of the alleged crimes, Aaden's age at the time of the alleged crimes, and the consideration of public safety as factors supporting transfer. The Court of Appeals engaged in a similar exercise in affirming the juvenile court's decision.[66]

We agree with the Court of Appeals that the juvenile court's finding that Aaden's case should be transferred is not untenable or unreasonable. The juvenile court did not abuse its discretion in ordering the transfer of Aaden's case to the adult docket of the county court.

## CONCLUSION

Aaden's due process rights were not violated, because his counsel had access to the State's evidence, his counsel was given an opportunity to function at the transfer hearing, and the State's evidence bore indicia of reliability. Further, the juvenile court's decision to transfer Aaden's case to the adult docket of the county court was not an abuse of discretion.

Affirmed.

---

[66] See *In re Interest of Aaden S., supra* note 1.